## Doe *ex. dem.* Vick & Reading *v.* Peck & Wife.

As the claims under British, and other ancient grants, were necessarily located and confirmed by the Board of Commissioners, prior to all others, the presumption is, that, they did not confirm younger grants from the government of the United States, conflicting with those ancient grants, especially, when the claimant under the ancient grant, has as much land in quantity as his grant calls for.

It seems that copies from the records in the land office, of notices and confirmation of claims, and the journals of the Commissioners, are competent evidence in questions of boundary.

It is sufficient, if the instruction given by the judge is substantially that which was asked by the counsel.

IN ERROR from the circuit court of Warren county.

This action of ejectment was commenced at the May term, 1836, of the Warren circuit court, against the defendant, Helen D., (then Glass.)

The premises claimed by plaintiffs, in virtue of a British grant, dated in 1776, and a United States patent issued in 1820, are described in the several demises from the lessors of the plaintiffs, as follows: "a certain messuage and lot, or tract of land, being a part of section nineteen, of township sixteen, of range three east, according to the maps and plats in the United States District of land at Washington, Mississippi, for the sale of lands in the district west of Pearl river," which part of said section is bounded as follows: beginning at a point on Glass's bayou, near the Mississippi, being the north-west corner of lot number one, in the plat of the town of Vicksburg, thence by the northern line of said town to the north-west corner of lot number one hundred and five in said town, thence north to the northern boundary of said section nineteen, thence by the same, west to the Mississippi river, thence down the same according to its meanders to a point due west of the place of beginning, thence east to the beginning, containing fifty acres, more or less, with the appurtenances, situate and being in said county of Warren, and said city of Vicksburg."

At the said May term, said Helen D. appeared and was admitted a defendant, upon entering into the consent rule, &c., and an order was made for a survey of the premises; whereupon at said May term, a declaration was filed against her, on the several demises of said John W. Vick and said Abraham B. Reading, to which by her attorney, she plead not guilty.

The cause was continued from term to term, till November term, 1837, when, by consent of parties, it was ordered by the court that the order of survey theretofore made be so amended as to authorise said survey to be made by any surveyor, and without notice to the opposite party. The cause was continued regularly to November Term, 1838. At said last term, by consent of parties and order of the court, said Talbot J. Peck, (he having intermarried with said Helen D.,) and said Helen D., his wife, were substituted as defendants in the suit. At said term, the cause was tried, and a verdict and judgment rendered in favor of the defendants. The plaintiffs' lessors iead in evidence, on the trial, the admission of defendants, by their counsel, in the words and figures following, to wit: "John Doe, demise of A. B. Reading, &c. *v.* Talbot J. Peck & wife, in Warren circuit court. In this cause it is admitted that a patent issued in 1820 from the President of the United States to Newet Vick, assignee of Andrew Glass, for section number nineteen, of township sixteen, range three, east, in the district of lands west of Pearl river; also two surveys of township number sixteen, of range three, east, of United States lands, in district west of Pearl river," which were admitted to be true copies. They also introduced and read as evidence a survey and notes made of the land in dispute, by Stephen Howard, with the admission by the defendants thereon endorsed, that it should be received as evidence. The plaintiffs proved that the defendant, Helen D., was in possession of the premises in dispute on 1st March, 1836, and the 26th April, 1836; and defendants admitted the same are embraced in the west end of diagram C. H. E. F., as designated on Howard's map and survey. The plaintiffs' lessor then read in evidence the probate and will of Newet Vick, deceased, by which it was shown that a tract of land belonging to said testator, devised to said John W. Vick and William Vick, had been divided between them by commissioners

appointed by the probate court of Warren county aforesaid, in which court said will had been duly proven and recorded, and that the part allotted to said John W. Vick covered and embraced the land in controversy in this suit.  The defendants admitted that John W. Vick is the devisee named in the will of said Newet Vick, and that he was over twenty-one years of age at the time of said division.  The plaintiffs' lessors also read in evidence a deed from said John W. Vick, to said Abraham B. Reading, for the land in controversy, dated 23d December, 1835.

The defendants then read in evidence a copy purporting to be from the files in the office of Thomas Newman, Register of the Land-office, Washington, Mississippi, a notice of his pre-emption claim for four hundred and eight acres of land, with the accompanying plat.  The defendant also read in evidence a paper purporting to be extracts from the journals of the commissioners appointed under an act of Congress, entitled "an act regulating the grants of lands, and providing for the disposal of the lands of the United States, south of the state of Tennessee," which showed that the board of commissioners met on the 1st of March, 1805, present Thomas Rodney and Robert Williams, and stated that, " No. 919, Andrew Glass claimed 408 acres of land as a pre-emption, situated on the Mississippi river, in Claiborne county, in virtue of his own settlement; and proved that the premises were inhabited and cultivated by and for the use of the claimant as early as 1802, and that the improvement on the land did not cost less than three hundred dollars."

Thursday, 6th March, 1806, the board ordered that the surveyor survey as pre-emption, No. 919, Andrew Glass 320 acres, on the river Mississippi, in Claiborne county.  On Wednesday, 24th December, 1806, they ordered that a location be made, No. 919, Andrew Glass, 408 acres, to hold according to his own survey and boundary reference to the same.  Monday, 29th of December, 1806, No. 919, Andrew Glass 320 acres, claim confirmed, certificate D. No. 307 issued.

The above extracts from the said journals were certified to be truly copied from the same by Thomas Newman, Register of the Land-office, at Washington, Mississippi.  The defendants also read a paper purporting to be a certificate, (or rather copy,)

which issued to said Andrew Glass by the said commissioners, for three hundred and twenty acres of land, dated 29th December, 1806. The defendants also proved by Joseph Sessions that in 1804 he was employed by Elihu Hall Bay to re-survey two tracts of land for him at the Walnut Hills. He found no marked trees, and was solely influenced by the map of the original grant. He commenced the survey near the mouth of a bayou now in the upper edge of the city of Vicksburg, called Glass's Bayou (at the time he gave his deposition). He found no evidences of location; he ran the courses and distances called for on the map; he did not find station or corner trees. He frequently saw blazes and chops on trees along the line, but he could not say they were line trees. He stated that the banks of the river had no marks of having fallen in at the mouth of the Bayou, from the time of the original survey until he surveyed it, and that the river bank had not changed since the time of his survey, but that the bayou had widened considerably. When he made the survey, he had the lines marked well around the survey of both tracts. In running the different tracts (the lines) of the survey, he found the branches and creeks which crossed the lines correspond almost exactly with the representation on the maps of the original grant.

He did not search for station or corner trees as called for on the map, but there may have been such on the lines he run. He frequently re-surveyed British surveys in this country, and uniformly found them correctly made, and the station trees, creeks, branches, and other marks called for, generally existed on the land as represented on the maps and patents.

It was the universal practice of the surveyors of the British grants to make corner and station trees on all the lines of the survey, which were generally easily found, but on the lines of Bay's claim none such were found, although he made some slight search occasionally for them. He stated said Hall was still alive, and a citizen of South Carolina, in which state he had been a judge for many years.

The defendants then read a paper purporting to be a copy certified by said Thomas Newman, Register, from the files of his office, of a notice of Elihu Hall Bay's claim, with the accompanying plat, for one thousand acres of land, granted in 1776, 6th

of May, by the British government to William Grant, and by subsequent conveyances vested (the title) in said Elihu Hall Bay. It was addressed to the commissioners under the act of Congress, passed 3d March, 1803.

To all the foregoing evidence of the defendants, the lessors of the plaintiff objected; but the court overruled the objection, and received the said evidence: to which opinion the lessors of the plaintiffs excepted before the jury retired, and in due time.

The defendants proved that the land in controversy was occupied by Anthony Glass from 1818 till the time of his death. The said witness also stated that he ran a part of the southern line of Bay's claim, as run by Sessions, and found the said lines well marked.

The lessors of the plaintiffs, before the jury retired, asked of the court the following instructions:

1. That the title to Newet Vick by patent passes a perfect government title to all the land actually embraced within section 19, of township 16, of range 3, east.

2. That if the jury believe that the land in controversy is embraced in section 19, of township 16, of range 3, east, and that no adverse title has been proved, they must find for the plaintiffs.

3. That Newet Vick was entitled to the whole of section No. 19, aforesaid, by virtue of the government patent, without respect to any pre-emption claim of Andrew Glass, not shown to be the foundation of that patent; which instruction the court refused to give, except with the additions made by the judge, as follows:

"The counsel for the plaintiffs offer in evidence three several maps or plats of the land in controversy, showing the location of the same. If the jury believe, from the maps and evidence so offered by plaintiffs and defendants, that the claim represented on the plats as a claim of Bay from the government is an *antient* claim, or older than the claim of the plaintiffs, the boundary of Bay's claim so represented on the map must be the boundary of section nineteen."

To which instruction the lessors of the plaintiffs excepted, and also excepted to the refusal to give the instructions as asked for without any addition thereto.

The plaintiffs moved for a new trial in the cause after the jury

had rendered their verdict, on the ground that the court had erred in the instruction to the jury, and that the verdict was against law and evidence; which motion the court overruled. To which opinion of the court the lessors of the plaintiffs also excepted.

At page 6 of the record, it is shown that before the jurors retired from the bar of the court, the lessors of the plaintiffs filed their bill of exceptions to the admission of the evidence of the defendants, as stated above.

Thompson for plaintiffs in error.

The counsel for the plaintiffs contend, that a patent having been issued to Newet Vick, in 1820, for section 19, as it had been surveyed by the government surveyor, he was invested with a perfect government title to the same, according to the boundary of his survey. See act of Congress of the 3d March, 1803, sec. 10, 11, Revised Code, page 510, 511. See act of Congress of the 18th May, 1796, Ingersoll's Digest, page 352. These acts require the surveyor to run and mark the lines and make the corners of the surveys, and mark them. The survey of Stephen Howard, received and made evidence in the cause by consent of the parties, proves clearly and incontestibly that the lines and corners of section 19 were well and distinctly marked by C. Defrancis, the deputy surveyor for the government, and that they embrace the land in controversy.

The surveyor is the officer of the government chosen for and not by the party. The thing actually done by him on the ground is to govern. By the lines and corners made by the surveyor, the government is concluded. See the case of Hunt's lessee *v.* Mc-Henry and Williams, Wright's Reports in 1 volume, of the decisions of the supreme court of Ohio, page 600. The court there say, "if the line was actually run before the patent, the patent is for the section surveyed. Where was the line run? is the question, not where it ought to have run."

"Whether the line originally run was in accordance with the law or not, is a question between the government and its officer. The section actually run out, is patented by its number, nothing else is patented, there are no calls in the patent for corners or lines."

In the case of Boardman and others *v.* the lessees of Reed and Ford and others, 6th Peters' Rep. page 342, the court say, "the court instructed the jury that the grant to the plaintiffs, which was given in evidence was a complete appropriation of the land therein described, and vested in the patentee the title, and that any defects in the preliminary steps by which it was acquired, were cured by the grant. There can be no doubt of the correctness of this instruction. This court have repeatedly decided, that at law, no facts behind the patent can be investigated. * * * The defects in an entry or survey cannot be taken advantage of at law, the patent appropriates the land, and gives the legal title to the patentee. The district court said nothing more than this, and it was justified in giving this instruction by the uniform decisions of this court."

In locating a patent, the enquiry first is, for the demarcations of boundary, natural or artificial, alluded to by the surveyor; if these can be found extant, or their locality can be proven, if now they are not existing, they are to govern.

The courses and distances specified in a plat and certificate of survey, are designed to describe the boundaries as actually run, and made by the surveyor, and to assist in preserving the evidences of the local position, to aid in tracing them while visible, and in establishing their former position in cases of destruction by time, accident or fraud. As guides for these purposes, the courses and distances named in a plat and certificate of survey are useful. But a line or corner established by a surveyor in making a survey upon which a grant has issued, cannot be altered, because the line is longer or shorter than the distance specified, or because the relative bearings between the abuttals, vary from the course named in the plat and certificate of survey.

So, if the line run by the surveyor, be not a right line, as supposed from his description, but be found by tracing it to be a curved line, yet the actual line must govern; the visible, actual boundary, the thing described, and not the ideal boundary, and imperfect description, is to be the guide and rule of property. 7th Monroe, 333, Baxter *v.* Evett's lessee. See 1 Call. 438, Shaw *v.* Clements. 3 Call. 239, Herbert *v.* Wise. 1 Hen. and Munf. 177, Baker *v.* Glasscocke. 1st vol. Pirtle's Dig. 128.

[Doe *ex dem.* Vick & Reading *v.* Peck & Wife.]

A mistake of the surveyor in describing the land surveyed, and represented on the plat, may be explained by natural objects, by going on the ground.    A grant calling west, north; and east, south; and south, east, may be obviated by the marked lines and corners, and other objects described and found on the ground.    5 Monroe, 176, Woods, &c. *v.* Kennedy.    Pirtle 127, vol. 1.

The court or jury are not bound to presume that the objects called for in a patent, were in existence on the ground at the date of the patent.    There is no estoppel created on this subject by the surveyor or the parties.    The acts done on the ground by the surveyor, constitute the survey.    He may make out his plat and certificate thereafter, and if he should misstate what was actually done on the ground, either through fraud or mistake, it would be alike preposterous and unjust to preclude a party from proving the truth, by the production of a false certificate.    If a patent calls for a black walnut at the end of two hundred poles, and it is proved that the surveyor actually stopped at one hundred and eighty poles, and marked a white walnut or a black locust, as the corner, we cannot admit that the patentee can disregard the corner thus proved, and extend his survey twenty poles further, under the idea that his patent is conclusive evidence that a black walnut was marked for him, and that not being found, he has a right to run out his distance.    3d J. J. Marshall, 420, Reid *v.* Langford.    Pirtle's Digest, vol. 1, page 129.

The legal presumption is, that the surveyor performed his duty of marking and bounding the survey by artificial or natural abuttals, either made or adopted at the time (execution) of the survey.

Section 19, then, having been patented to Newet Vick, in 1820, the title of the lessors of the plaintiffs being shown to have been regularly derived from him, and it having been admitted on the trial that the defendants were at the institution of this suit in possession of the land in controversy, the question arises, what was there in the cause to prevent a judgment going in their favor?

The defendants show no title, either legal or equitable, in themselves, or outstanding in another.    Nor do they show such a length of possession as to form a bar to this action.

But they first offered to read to the jury, a paper, purporting to be a copy (certified by the Register of the land office) of the notice

filed by Andrew Glass, of his pre-emption claim.   This paper
was admitted by the court as evidence, which is one of the errors
assigned.   It is contended, first, that this is not competent evi-
dence.   Was it introduced to show that the survey as actually
made, embraced more land than was claimed under the pre-emp-
tion right?

It could not have been done, legitimately, for this purpose.   It
would have been going behind the patent, which cannot be done.
See the case before cited in 6 Peters, 328.

2. Was this paper admissible evidence for the purpose of cir-
cumscribing the claim of Andrew Glass, and limiting the northern
boundary to the southern line of Bay's claim, as laid down upon
the government plat?

· This could not be done, for it would contravene all the author-
ities cited on this subject, under the head of boundary.

3. If evidence of this description could be legally admitted for
any purpose, this paper should not have been received, for it is
no record; it has the simple certificate of the register, that it was
truly copied from the original on file in his office.   See Revised
Code, p. 190; 1 Starkey's Evidence, ed. 1834, p. 162 to 170, top
paging; and see the notes and various authorities there cited.

The defendants next read in evidence to the jury, the paper
marked No. 7, in the bill of exceptions, see 14th page of the re-
cord, purporting to be " extracts from the journals of the commis-
sioners appointed under an act of Congress, entitled, 'an act reg-
ulating the grants of lands, and providing for the disposal of lands
of the United States, south of the state of Tennessee.' "   This
paper was certified to be extracts truly copied from the journals
of the commissioners appointed as aforesaid, from the records of
the same in his office, by Thos. W. Newman, register of the land
office, at Washington, Mississippi.

1. The same objections apply to the admission of this paper as
evidence, on the ground of incompetency, that were applicable
to the paper No. 6, just adverted to, and the same authorities will
sustain the objections, and show the court erred in not ruling it
out.   See 6 Peters, 328, &c. (Case before cited.)

2. If evidence of this character could be admitted, this paper, if
possible, is more objectionable in relation to its authentication,

than No. 6.    It is certified to be extracts from a record.   Nothing could be more delusive than garbled extracts from a record, and nothing is better settled than if you wish to use a record to establish a fact, you must produce all the record in relation to that subject.    As a record contains such verity on its face that it cannot be contradicted, that the whole of it in relation to the subject matter should be produced, is manifest.    See 1 Starkey's Evidence, p. 163, ed. 1834.

3.  Moreover, the register is not the proper person to have certified a copy of the record of the proceedings of the commissioners. See act of Congress of 3d March, 1803, Revised Code, p. 508, and also p. 190.

The government map shows that Andrew Glass's certificate was for 394.34 acres, which proves that if the claim in controversy has any connection with these copies of the journals, &c. that there was some further action on the subject by the commissioners, which has by the defendants not been produced.    That this was the effect of design in this case, and not mere omission, we do not pretend to say.    We only argue the law in its application and conclusions to this, as to all cases similarly situated.    The faith of a keeper of a record is pledged to the truth, *and the whole truth* of *a copy* of the record; but not so, of an extract, which on its face professes to be partial; his faith is only pledged, that so far as the record is copied, it is correctly done.    Lastly, the defendants in relation to the claim of Andrew Glass, read the paper No. 8, (see p. 15 of the record,) purporting to be a copy of the original certificate to Andrew Glass, now on file in his office, certified by the register.    To the competency of this evidence, the same objections and authorities apply as to Nos. 6 and 7.    There is no law, statutory or common, which will admit it on the register's certificate.    Revised Code, 190.

The defendants closed their evidence by reading the paper marked No. 10, purporting to be a certified copy by the Register, from the files in his office, of the plat and nature of the claim of E. H. Bay.    This paper (the original,) is without date.    The act of Congress of the 3d March, 1803, (see Revised Code, p. 506,) required it to be filed on or before the last day of March, 1804. By the act of Congress of March 27th, 1804, the time was ex-

tended to the last of November, 1804, (see Revised Code, p. 512.) By the act of Congress of the 2d March, 1805, the time was again extended to the 1st December, 1805, (see Revised Code, p. 515,) but with the proviso that, "if any such person shall neglect to file such British grant, and to have the same recorded, in the manner and time hereby provided, neither such grant, nor any other evidence of such claim which shall not have been recorded, as above directed, shall ever after be considered or admitted as evidence in any court of the United States, against any grant derived from the United States." When was the original, of which this paper purports to be a copy, filed with the Register? there is no evidence. Nor is there any evidence of any action of the commissioners on it. The patent, &c. were not recorded as required by the acts of Congress. This paper is not competent and legitimate proof of any thing, but when solemnly admitted as competent evidence under the sanction of the court, there is no knowing what a jury might not consider it as proving; even to the extent of establishing a perfect title in E. H. Bay. We think the court itself, having erred in its admission, was manifestly deluded by it, and allowed to it a controlling influence in its charge to the jury.

There is nothing, then, to sustain the opinion of the court, in restricting the claim of the plaintiffs to Bay's boundary, as laid down upon the government map.

If the whole of the evidence is retained, which we contend should have been ruled out by the court, still we ask by what authority, when section 19 was patented to Newet Vick, from whom the lessors of the plaintiffs regularly derive title, and the survey (*actually made,*) on which the patent issued covers the land in controversy, are we to go behind the patent; and that, when the defendants have not shown a color of title, either legal or equitable in themselves, or any other person?

Montgomery, for defendants.

The first question is, did the court err in admitting the notice of claims made by Andrew Glass to the land now embraced in section 19, of town 16, of range 3, east, and the extracts from the books of the board of commissioners and certificates of pre-emption?

Those claiming right to pre-emption are required to give notice of their claim. Act of Congress, 3d March, 1803, section 3—5. Those claiming under British grants, are required to present notice of their claim to the register of the land-office, with a copy of the plat, and also file the written evidences of his claim, to be recorded. Same statute, sec. 5; Rev. Code, 506.

By this statute, the notice of the claim and plat clearly appertain and belong to the register's office.

By the 6th section, same act, the register and two others are appointed commissioners to investigate claims under that act, &c. and to appoint a clerk, who is to record their proceedings and the evidence on which the decisions are founded. Books and papers, on the dissolution of the board, to be lodged in the office of secretary of state. Rev. Code, 507—8.

The books of former commissioners to be lodged with the registers of the land office for the respective districts. Rev. Code, 533.

By the 6th section, the certificate granted by the board of commissioners to be entered with the register, and by him recorded. Rev. Code, 508.

An assistant register to be appointed, to record grants, deeds, and other evidences of claims, on the register's books. Act 27th March, 1804, sec. 5.

Register and receiver to make out a report of claims granted prior to 27th October, 1795, which have not been confirmed, together with the evidence in support of such claims. Act of 21st March, 1808, sec. 4.

This last act presupposes the records remain with the register, otherwise they could not be supposed to be able to make the necessary report.

We must believe the legislature knew the facts on which they were legislating, among which is the fact, that the records of the board of commissioners remained in the register's office, when the law was passed, making copies of the land-office records evidence. Rev. Code.

But that portion of the evidence which purports to be extracts from the books is not only immaterial, but militates against the party introducing it; and it has been repeatedly decided by this court, that when the evidence admitted was immaterial and could

have had no influence on the fate of the case, the judgment will
not be reversed.

This case being before the court on an appeal from the deci-
sion of the court on a motion for a new trial, the court should
examine the whole of the evidence, and be satisfied injustice had
been done to the plaintiffs, before a new trial is awarded.

The plaintiffs claim as assignees of Andrew Glass, and the map
exhibited by them shows Andrew Glass's claim represented as a
pre-emption, embracing section 19, of town 16, of range 3, east.

The notice of claim filed by Andrew Glass represents the land
as occupying the ground now known as section 19, of town 16,
of range 3, east, and bounded on the north by Elihu Hall Bay's
British grant.

Under the act of Congress of 3d March, 1803, Revised Code,
505—6, the commissioners were not at liberty to grant a certifi-
cate of pre-emption to land which was claimed by virtue of a
British grant.

The defendants proved, as appears from the bill of exceptions,
that Andrew Glass's claim for a pre-emption conflicted with
Bay's claim, under a British grant; and the circumstance that
Glass claimed under his survey 408 acres, and the map on its
face has a dotted line representing the confliction, with the word
"compromise" written on it, and the certificate for only 320
acres, which is the amount free from confliction, shows conclu-
sively that Glass's claim was reduced the amount it conflicted
with Bay's claim.

Colonel Sessions's evidence establishes the lower line of Bay's
claim to commence at the mouth of Glass's bayou, and is the
same line under which the parties now hold possession.

The township map read in evidence to the jury by the plain-
tiffs shows that the northern boundary of section nineteen, which
they claim, is the southern boundary of Elihu H. Bay's British
grant. And to identify the line, it was necessary the plaintiffs
should show that the line between Bay's claim and section 19
had been located in a particular place, or that the northern line
of section 19 had been run and marked by a surveyor under the
authority of the government of the United States, and that the
line was north of the line which commences at the mouth of

[Doe *ex dem.* Vick & Reading *v.* Peck & Wife.]

Glass's bayou, or they are not entitled to recover. The only evidence of a boundary line on the north end of section 19 is contained on Howard's map; from which it is extremely uncertain when the lines which he traced were run: but, giving it all the weight it can have, it only shows that by commencing at the lower end of the section on the river, and running the lines according to course and distance, the eastern boundary of section nineteen would extend far enough to embrace the land in controversy, and that the line was marked till he came near the end of the distance called for; but there was no corner nor any line run from the eastern boundary to the river; nor any traces of the division line between section 19 and Bay's claim.

The objection raised by plaintiffs, that there is no connection shown between Andrew Glass's pre-emption claim, and the plaintiffs' patent, is untenable. The patent recites that the patentee is assignee of Andrew Glass, and the identity of the land shows that the patent was based on the pre-emption claim of Andrew Glass.

It appeared from the evidence that the plaintiffs' grantors and their ancestors and Glass, had been in possession for many years, according to the line as run by Sessions. And it is a well settled rule, that when parties have acquiesced in a location for a long period, as the true boundaries, that they are concluded from denying the correctness of the location. 7 J. R. 238. 9 J. R. 101. 13 do. 348. 17 do. 30. 1 C. R. 358. 17 Mass. 209–10–11.

The instruction given by the court, (that if the jury believe the claim of Bay as represented on the map, is an older claim than the plaintiffs, the boundary of Bay's claim is the boundary of section 19) is not erroneous, although there is much of it wholly unnecessary. It is unquestionably true, that the south boundary of the section represented on plaintiffs maps of the township, as read in evidence as Bay's claim, is the north boundary of sec. 19, and there was abundant evidence before the jury, of the boundary of Bay's claim, and that it had been regularly filed with the register as a British claim, and the government having reserved it from sale, and having surveyed the adjoining land according to the boundaries of Bay's claim, it became the established boundary of the adjoining claims.

The only evidence of location shown by the plaintiffs, was the

[Doe *ex dem.* Vick & Reading *v.* Peck & Wife.]

maps on which Bay's claim is laid down as the northern boundary of their land, and we proved clearly by Joseph Sessions, and the map accompanying Bay's notice of claim, as filed before the regis ter, that the south boundary of Bay's claim began at the mouth of Glass's bayou, and that defendants were not in possession of any land, south of that line, consequently, the plaintiffs have no title, and the instruction of the court when viewed with reference to all the circumstances of the case, was correct enough.

The plaintiffs' evidence must be taken most strongly against them, and having introduced a map to define the boundaries of their land, which represents one of the boundary lines, as the line of an ancient British survey, it was their duty to show where that line was. If they relied on any other line, they should have shown it, and by what authority it was made.

But the controversy relative to this confliction of boundary, before the land commissioners, is conclusive of the question. It appears manifest from the evidence taken, from the mark "compromise," on Glass's map, and the fact that the certificate of pre-emption calls for less than the notice of the claim by the amount in controversy, there is no room to doubt that the matter was settled by them, and the pre-emption only granted for so much as did not conflict with Bay's claim.

The map accompanying Glass's notice of claim shows how and when the line was made, which is mentioned and laid down by Howard on his map.

The act of Congress of 3d March, 1803, required the claimant to present a notice of his claim with a map of the same, to make which a survey was necessary, and in making that survey the line was run which conflicts with Bay's claim, and embraces the land in possession of defendants. There was no other evidence when the line was made, and this conjecture accounts for its existence fully. That being a private survey, and having been abandoned before the commissioners, is not entitled to any weight, and if thrown out of the case, there is no foundation whatever for this suit.

Mr. Justice TURNER delivered the opinion of the court.

This is an action of ejectment brought by the plaintiffs against

the defendants before the circuit court of Warren county, for about fifty acres of land, part of section No. 19, of township 16, range 3, east, according to the maps and plats in the United States district of lands at Washington, Mississippi, for the sale of lands in the district west of Pearl river.   A verdict, on the issue joined on the plea of not guilty, was rendered in favor of the defendants.   The plaintiffs moved the court for a new trial, which motion was overruled, and judgment rendered in favor of the defendants according to the verdict.

A bill of exceptions both to the admission of evidence, and to the charge of the presiding judge, was taken, signed, and makes part of the record.

And the case comes before us on a writ of error.   The plaintiffs have assigned errors in the record, fourteen in number.   The substance of them amounts to this, that certain copies of land office records were improperly admitted to go to the jury; that the court erred in giving instructions to the jury; and in overruling a motion for a new trial.

This appears to me to be a question of boundary, and as such it will be treated.   I have looked carefully into the case, in every particular, and given it much consideration; and a brief view of the whole matter embraced in the record is deemed sufficient for all the purposes of justice.

It appears that the plaintiffs claim title to the land in question by virtue of the 3rd section of the act of Congress, entitled "an act regulating the grants of land, and providing for the disposal of the lands of the United States, South of the state of Tennessee," passed March 3d, 1803.   See statute laws of Mississippi, by Howard & Hutchinson, p. 743.   That act gives a right of preference in becoming the purchaser of the United States, of the vacant lands of the United States to certain persons, and on certain conditions, but restricted the claimant *to land not claimed by virtue of any British grant, &c.,* it also provided for other settlers, and for other claimants, for the registry of all claims, plats, title deeds, &c., established a Board of Commissioners to investigate and decide on all the claims to land in said district, provided for all surveys, general and special, and by the 6th section of that act provided, "that whenever a tract of land to which any person might be en-

titled, by virtue of the three first sections of this act, shall also be claimed by the holder of a British patent, legally and fully executed, and duly recorded in conformity to the provisions of this act, who is *not confirmed* in his claim by the articles of agreement above mentioned, the Commissioners shall, in the certificate granted to the person claiming the land, by virtue of this act, *state the existence of the adverse claims,* in which case the party shall not be entitled to a patent, unless he shall have obtained in his favor a judicial decision, in a court having jurisdiction therein."

In 1803, the government of the United States had obtained, by compromise with the state of Georgia, the right to possess and dispose of all the lands in the Mississippi territory, not confirmed to individuals by virtue of the articles of cession and agreement with Georgia, or by treaties with foreign nations; and by the act aforesaid of 1803, the general government commenced the important work, of granting lands, and providing for the disposal of lands, for ascertaining all private claims thereto, and for the survey and sale of the residue. A system of surveys had been prescribed, by townships, sections, numbers, &c., so as to avoid conflictions, &c.

Under the provisions of this act, it appears by the record, that A. Glass filed a claim for a pre-emption, to the extent of 408 acres, and that E. H. Bay filed a claim for a tract of 1000 acres in the same neighborhood, claiming by virtue of a legally and fully executed British grant. Each claimant was required to file with the Register of the land office at Washington, a notice of his claim, showing its nature and extent, and also a plat of the land claimed. The British claimant, having a patent, had, as a matter of course his ancient survey, made previous to the year 1782, as we find by the collection of treaties, conventions, and laws made under the authority of the general government. But the pre-emptioner, having possessed no right, but that given by the act of 1803, had to make his own location and survey, so as to furnish the plat required to accompany his notice. Hence we find by the evidence, marks of a survey in this case, conflicting with Bay's supposed ancient survey. It is not known whether Glass, when he made his incipient survey, had any knowledge of Bay's claim,

until it was brought to light through the medium of the land of-fice at Washington, where all claimants to land in this district, west of Pearl river, had to file their claims, in a given time.

It is obvious, that the district surveyor could not proceed with the general survey, so as to designate the township, section, &c., belonging to the government, until all private claims were brought forward and surveyed by that officer. But when that was done, the public lands were surveyed, and the numbering of sections of vacant lands commenced, and also the numbering of the pre-emp-tion, and donation, and other claims under the act aforesaid. Thus we find on the evidence of title exhibited in this case, and the maps taken from the land office record, that 'Glass's claim bears the No. 19, township 16, range 3, east. Bay's tract, No. 13, and so on of others.

From this view of the act of Congress, the surveys, &c., we come to these conclusions, that if the board of Commissioners who confirmed Glass's pre-emption claim, had knowledge also of Bay's claim, and found Bay's to be a British patent, filed, &c. according to law, that the board was not authorised to give Glass the *un-conditional certificate in question,* (and we are not to presume they violated the law;) that when they confirmed his claim uncon-ditionally, for 320 acres, designated as No. 19, they did not intend to interfere with Bay's claim, especially as Glass has more than his quantity of land, without going above Bay's south boundary line, and hence that there is no confliction; and I am of opinion that the plaintiff has not given the best evidence of the survey of his claim, as made of his 320 acres, confirmed to him by the board of Commissioners.

Our statutes have made legal evidence copies of the land office records. Revised Code, 190; Hutchinson & Howard's stat. laws, 605; see also the act of 1837, *Ib.* 610. The judge of the court below did not err in admitting those copies, which were offered and objected to, to go to the jury. They appear to have been competent evidence, to establish an ancient boundary line, if not to show title; especially when taken in connection with the evi-dence of Mrs. Peck's ancient possession, the possession of herself, and of those under whom she claimed; and this view of the case is further illustrated by the memorandum on Glass's original plat,

[Doe *ex dem.* Vick & Reading *v.* Peck & Wife.]

filed with his notice, viz: "Interference, Judge Bay's 88 acres land compromised, 320, balance," as well as by the testimony of Sessions and Templeton, and of Howard, who had run the lines in question. It further appears that the board of Commissioners ordered Glass's tract of 320 acres to be surveyed.

The court did not err in its charge to the jury. It is true the charge is not exactly a response to that asked of the court, but it is in substance, taken in connection with the evidence about which, or the effect of which, the charge was asked.

Taking all the evidence together, it clearly appears to me, that the plaintiffs have all the land conceded to them by the board of Commissioners, and more too by 42 and 97 hundredth acres, that their pre-emption claim was located below the line commencing at the mouth of Glass's bayou, (formerly called Watkins' bayou,) that their claim of section 19, does not conflict with the claims of those above that boundary, and was never intended so to conflict, and that the court did not err, in refusing to grant a new trial. One action of ejectment is no bar to another, hence, it is unusual to grant new trials in such cases, especially when it appears that justice has been done. See the case of Ross *v.* Barland & others, Walker's Rep. 489.

Let the judgment be affirmed.

Judge SHARKEY gave no opinion.